IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

JESSE TYSON, JR.,

                   Plaintiff,                    CV-08-0173-ST

        v.                                FINDINGS AND
                                            RECOMMENDATION

OREGON DEPARTMENT OF CORRECTIONS,
a political subdivision of the State of Oregon, *et al*.,

                   Defendants.

STEWART, Magistrate Judge:

## **INTRODUCTION**

       Plaintiff, Jesse Tyson ("Tyson"), appearing *pro se*, is an inmate with the Oregon

Department of Corrections ("ODOC").   Tyson was housed at Coffee Creek Correctional Facility

("CCCF") in Wilsonville, Oregon, during the events at issue in the summer of 2007 and is

currently incarcerated at Snake River Correctional Institution ("SRCI"), in Ontario, Oregon.

1 - FINDINGS AND RECOMMENDATION

Tyson alleges a claim under 42 USC § 1983 for violations of the Fourth and Fourteenth Amendments (First, Second, and Third Causes of Action) against defendants ODOC, three ODOC officers (Sergeant David Peterson, Correctional Officer Scott Vetter, and ODOC Superintendent Max Williams), and Oregon State Police Detective Terri Cassebarth. Tyson also alleges supplemental common law claims against all defendants for intentional infliction of emotional distress, negligence, and assault. Tyson seeks a permanent injunction to establish: (1) oversight and restructuring of ODOC; (2) the appointment of a monitor to control ODOC; (3) citizen at large oversight of ODOC to give recommendations to a district attorney; and (4) citizen at large oversight of ODOC's use of physical force against inmates. Tyson also seeks $10,000 in compensatory damages and $50,000 in punitive damages from each defendant for each separate legal wrong, as well as attorney fees and expert witness fees.

Defendants have filed a Motion for Summary Judgment on all claims (docket #66). On June 4, 2008, this court issued a Summary Judgment Advice Notice (docket #10) advising Tyson of the requirements pertaining to such motions. For the reasons that follow, defendants' motion should be should be granted, and judgment should be entered in defendants' favor.

## STANDARDS

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. FRCP 56(c). The initial burden is on the moving party to point out the absence of any genuine issue of material fact. Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 US 317, 323 (1986). On a motion for summary judgment, the court "must view the

evidence on summary judgment in the light most favorable to the non-moving party and draw all

reasonable inferences in favor of that party." *Nicholson v. Hyannis Air Serv., Inc.*, 580 F3d 1116,

1122 n1 (9th Cir 2009) (internal quotation omitted).

## UNDISPUTED FACTS

On July 25, 2007, Tyson and four other inmate orderlies were serving breakfast to

inmates housed in the O-Unit of CCCF.  Declaration of Scott Vetter ("Vetter Decl."), ¶ 6.  Scott

Vetter ("Vetter") was the sole correctional staff member on O-Unit at that time.  *Id*, ¶ 5.

Sometime between 6:20 and 6:30 am, Tyson and one of the occupants of cell O-121 exchanged

disparaging remarks.  *Id*, ¶ 7; Complaint, ¶ 11.  Tyson approached cell O-121 and said that the

matter could be taken up in the yard.  *Id.*  He then bent down and punched into cell O-121 with a

closed fist.  Vetter Decl., ¶ 7.

Vetter immediately gave Tyson a direct order to "cell-in," meaning that the prisoner must

return immediately to his assigned cell.  *Id*, ¶ 8.  Tyson replied, "I'm not going to," and began

walking towards his cell O-108A while yelling that he was not going to cell-in.  *Id*, ¶ 9.  Vetter

radioed Sergeant David Peterson ("Peterson") for assistance.  *Id*, ¶ 9; Declaration of David

Peterson ("Peterson Decl."), ¶ 3.

Tyson stopped between cells O-108 and O-109.  Vetter Decl., ¶ 10.  He refused two direct

orders by Vetter to face the wall before complying with a third order.  *Id.*  Peterson soon arrived

and stood approximately 12 to 15 feet to the right and behind Tyson and 10 feet to the right of

Vetter.  *Id*; Peterson Decl., ¶¶ 3-4.  In order to apply restraints, Vetter ordered Tyson to place his

hands behind his back, but Tyson refused.  Vetter Decl., ¶ 11.  After again ordering him to place

his hands behind his back, Tyson only put his hands to his side and said he was not putting his hands behind his back. *Id*, ¶ 12.

Peterson then drew his OC (oleoresin capsicum) spray (also known as pepper spray) and pointed it at Tyson. Peterson Decl., ¶ 5. He gave Tyson two orders to get against the wall, both of which Tyson refused. *Id.* Peterson then warned Tyson that if he did not comply with orders, he would be sprayed. *Id*; Trial Tr. 133 (Peterson).[1] Tyson responded, "You spray me and I will kick your ass." Peterson Decl., ¶ 5; Vetter Decl., ¶ 12; Trial Tr. 63 (Vetter), 133 (Peterson), 348-49, 362 (Andrew McKay). Peterson then told Tyson to put his hands behind his back. Peterson Decl., ¶ 5. Eventually Tyson complied. *Id.* Peterson repeated to Tyson that if he moved he would be sprayed. *Id*; Trial Tr. 134 (Peterson).

Vetter took a few steps closer to Tyson to apply the wrist restraints. Peterson Decl., ¶ 6. Tyson then turned his head to the left towards Vetter.[2] *Id*; Trial Tr. 134 (Peterson). Peterson applied a two second burst of OC spray to Tyson's face. Peterson Decl., ¶ 6; Vetter Decl., ¶ 13. As Peterson radioed CCCF Master Control to request assistance, Tyson charged him. Peterson Decl., ¶¶ 6-7. Vetter attempted to take Tyson to the floor and restrain him, but he broke free. Vetter Decl., ¶ 13. Tyson grabbed Peterson's radio and swung the microphone in a figure eight pattern. *Id.* The microphone struck Vetter on the left side of his face and his left ear. *Id.* Tyson

---

[1] Citations are to the page number of the transcript from Tyson's criminal trial in Washington County Circuit Court, *State v. Tyson*, CO 72576CR, which is attached to the Declaration of Kristen Winges-Yanez (docket # 75).

[2] The testimony of Vetter and Peterson is inconsistent as to what Tyson did before Peterson sprayed him. Vetter says that Peterson sprayed Tyson "after Tyson turned to his right and lunged at Sergeant Peterson." Peterson Decl., ¶ 12. Peterson says that after Vetter "took a couple of steps toward the inmate (to apply wrist restraints), Inmate Tyson turned to his left towards Officer Vetter" which caused Peterson to spray Tyson. Peterson Decl., ¶ 6. Tyson says that he turned to his right and lunged at Peterson "after being maliciously sprayed in the face by Peterson." Tyson Decl., pp. 2-3. For purposes of this motion, this court accepts Tyson's facts (consistent with Peterson's testimony) that he was sprayed after he turned left towards Vetter and that the spraying then caused him to then lunge right towards Peterson.

then threw the microphone on the floor, took an aggressive fighting stance, and charged Vetter, striking him with a closed fist in the face. *Id*; Trial Tr., pp. 66-67 (Vetter), 137 (Peterson), 329-30 (Mick Noah). Vetter struck Tyson and pinned him to the wall. Vetter Decl., ¶ 13. First responders soon arrived and placed Tyson on the floor to apply restraints. *Id*. Tyson was then escorted off the unit. *Id*. During this time, Peterson continued to administer bursts of OC spray until his canister was empty. Peterson Decl., ¶ 9. Four other inmates were on the unit dayroom at that time. *Id*.

Tyson was seen by medical staff immediately after the altercation. Decl. of John M Vargo, D.O. ("Dr. Vargo's Decl."), ¶ 5. Tyson reported that he had been sprayed and believed his bridge had been knocked loose. *Id*, Attach. 2. The nurse observed Tyson with red, weeping eyes, a heavily running nose, and blood on his right cheek. *Id*. He refused medical attention. On June 29, 2007, Tyson requested medical attention for injuries related to the July 25 incident. *Id*, ¶ 8. The nurse did not observe any signs of distress, Tyson was alert and oriented, his speech was clear and his affect was defensive. *Id*, Attach. 2.

Vetter was taken to Meridian Park Hospital's emergency room where he was treated for back pain, shoulder pain, and a fractured finger. Vetter Decl., ¶ 14. Peterson was taken to Meridian Park Hospital and examined for exposure to OC spray. Peterson Decl., ¶ 12.

Vetter issued Tyson a misconduct report for violations of Inmate Rules of Prohibited Conduct: Rule 2(A) (Assault I), Rule 2(c) (Disrespect I), Rule 4(a) (Disobedience of an Order I), and Rule 4(l) (Unauthorized Area I). Vetter Decl., ¶ 15. Coleen Clemente, the Hearings Officer at the Oregon State Penitentiary, held a disciplinary hearing on August 1, 2007. Declaration of

5 - FINDINGS AND RECOMMENDATION

Coleen Clemente ("Clemente Decl."), ¶ 4.  Tyson denied the charges and requested an

investigation and witness testimony, which was granted.  *Id*, ¶ 5.

Detective Terri Cassebarth ("Cassebarth") conducted an investigation and, with the

assistance of State Police Detective Fryling, interviewed Tyson on August 8, 2007.  Declaration

of Terri Cassebarth ("Cassebarth Decl."), ¶ 8.  Tyson declined to give any information about the

incident and only said it was under investigation.  *Id*.

Sometime during the investigation, Vetter was working in the CCCF mail room and

discovered a letter from Tyson to another inmate.  Vetter Decl., ¶ 20.  Tyson appeared to be

instructing his cell mate to contact other inmates who were on the O-Unit on August 27, 2007,

and tell them what to say if they were interviewed.  *Id*; Cassebarth Decl., ¶ 9, Attach. 1, pp. 12-

15.  The letter was copied and placed in state police evidence.  Vetter Decl., ¶ 20.

On September 24, 2007, Clemente read Tyson the investigation reports.  Clemente Decl.,

¶ 6.  After considering the evidence, including Tyson's testimony, Clemente recommended that

Tyson be sanctioned for violating several prison rules as a result of the incident, including Rules

2(a), 2(e), and 4(a).  *Id*, ¶ 7.  In her Findings of Fact, Conclusions of Law and Order submitted to

Superintendent Humbert, Clemente recommended a disciplinary sanction of 120 days plus 50%

upward deviation of 60 days for a total of 180 days in disciplinary segregation to run from

July 25 to January 20, 2008; a $200.00 disciplinary fine; 14 days loss of privileges upon release

for disciplinary segregation; and a retraction of 30 days earned time credits.  *Id*, ¶¶ 9-10.  On

September 26, 2007, Superintendent Humbert affirmed her findings.  *Id*, ¶ 11.

Tyson wrote to Superintendent Belleque rejecting the findings.  *Id*, ¶ 12, Attach. 2, p. 8.

Tyson did not seek administrative review by the Inspector General.  *Id*, ¶ 13.

Tyson was also charged by the Washington County District Attorney with Assault in the Second Degree and Assaulting a Public Safety Officer. Trial Tr., pp. 20, 561. At trial, the jury heard testimony from numerous witnesses including Vetter, Peterson, and five inmates who were on the O-unit during the incident. Tyson did not testify at trial, but claimed that his use of force against Vetter was justified as self defense. *Id*, pp. 564-65. The jury found Tyson not guilty of Assault in the Second Degree, but guilty of a lesser included offense of Assault in the Fourth Degree and of Assaulting a Public Safety Officer. *Id,* pp. 571-72. Because of a long history of assaulting public officials, Tyson received an upward departure sentence of 48 months in prison; one year of post prison supervision; a $607 unitary assessment, and $4,018.86 in restitution. *Id,* pp. 653-55.

<u>**FINDINGS**</u>

### I. <u>Claims Against State of Oregon</u>

Tyson alleges claims against ODOC, three of its employees, and Cassebarth, suing the latter four defendants in both their official and personal capacities. Complaint, ¶ 4.

As a state agency, ODOC is immune from liability for Tyson's claims under the Eleventh Amendment. *Edleman v. Jordan*, 415 US 651, 673 (1984); *Pennhurst State Sch. and Hosp. v. Halderman*, 465 US 89 (1984). Furthermore, 42 USC § 1983 only permits recovery against persons acting under the color of state law, and the ODOC is not a person for purposes of such claims. *Will v. Michigan Dep't of State Police*, 491 US 58, 70-71 (1989).

Suits for damages brought against state employees acting in their official capacities also are barred by the Eleventh Amendment under the theory that the suit is actually against the State, not the individual. *Kentucky v. Graham*, 473 US 159 (1985); *Edelman*, 415 US at 663; *Pena v.*

*Gardner*, 976 F2d 469, 472 (9th Cir 1992).  Accordingly, ODOC and the individual defendants

acting in their official capacities should be granted summary judgment against Tyson's § 1983

claims.

## II.  <u>State Tort Claims</u>

Tyson alleges tort claims for intentional infliction of emotional distress, negligence, and

assault.  Complaint, ¶¶ 38-40.  Under the Oregon Tort Claims Act, "every public body is subject

to action or suit for its torts and those of its officers, employees and agents acting within the

scope of their employment or duties. . . ."  ORS 30.265.  However, the sole action Tyson may

pursue is "an action against the public body" which must be substituted as the sole defendant:

> The remedy provided by [the OTCA] is exclusive of any other action or
> suit against any such officer, employee or agent of a public body whose act
> or omission within the scope of the officer's employee's or agent's
> employment or duties gives rise to the action or suit.  No other form of
> civil action or suit shall be permitted.  If an action or suit is filed against an
> officer, employee or agent of a public body, on appropriate motion the
> public body shall be substituted as the only defendant.

*Id*.

Under this authority, the State of Oregon must be substituted for all defendants and, thus,

is the only proper defendant for these tort claims.  However, as previously discussed, the State of

Oregon is immune from suit under the Eleventh Amendment.  Thus, defendants should be

granted summary judgment against the tort claims.

## III.  <u>§ 1983 Claims</u>

The only remaining claims are alleged under § 1983 against the four individual

defendants in their personal capacities.  As discussed next, defendants should be granted

summary judgment against those claims as well.

A.  **No Respondeat Superior Liability**

A plaintiff may bring an action under § 1983 to redress violations of his "rights,

privileges, or immunities secured by the Constitution and [federal] laws" by a person or entity,

including a municipality, acting under the color of state law.  *Monell v. Dep't of Soc. Servs. of*

*City of New York*, 436 US 658, 690-95 (1978).  "A plaintiff must allege facts, not simply

conclusions, that show that an individual was personally involved in the deprivation of his civil

rights.  Liability under § 1983 must be based on the personal involvement of the defendant."

*Barren v. Harrington*, 152 F3d 1193, 1194 (9th Cir 1998), citing *May v. Enomoto*, 633 F2d 164,

167 (9th Cir 1980).  Simply put, "[t]here is no *respondeat superior* liability under § 1983."

*Mortimer v. Baca*, 594 F3d 714, 722 (9th Cir 2010), citing *Monell*, 436 US at 691.

"Supervisors can be held liable for the actions of their subordinates (1) for setting in

motion a series of acts by others, or knowingly refusing to terminate a series of acts by others,

which they knew or reasonably should have known would cause others to inflict constitutional

injury; (2) for culpable action or inaction in training, supervision, or control of subordinates;

(3) for acquiescence in the constitutional deprivation by subordinates; or (4) for conduct that

shows a 'reckless or callous indifference to the rights of others.'" *Al- Kidd v. Ashcroft,* 580 F3d

949, 964-65 (9th Cir 2005), citing and quoting *Larez v. City of Los Angeles*, 946 F2d 630, 646 (9th

Cir 1991).

Tyson generally alleges that "each defendant was aware" of his right to be free from

excessive force and unreasonable search and seizure.  Complaint, ¶¶ 30-31.  In addition, he

alleges that:

> Each defendant was complicit in a conspiracy to maintain a system of
> encouraging physical assaults and encouraging false arrests to cover up
> those physical assaults.  Systemic deficiencies in disciplining ODOC
> employees, and/or actual ratifying assaultive behavior, caused each
> defendant individually to believe that they could in fact physically assault
> plaintiff and then bring a false arrest and prosecution to cover up their
> assaultive behavior.

*Id*, ¶ 32.

Vetter and Peterson were involved in the incident, and Cassebarth was involved in the

investigation.  However, Williams played no part in either the incident or the investigation and is

mentioned only as the recipient of a complaint filed by Tyson.  Complaint, ¶ 25.  Despite his

general allegation that all defendants, including Williams, were part of deficient training and

discipline, he has submitted no facts to support that allegation and cannot subject Williams to

liability for Peterson's and Vetter's actions.  Thus, Williams should be granted summary

judgment against the § 1983 claims.

## B.  <u>Qualified Immunity</u>

The remaining three individual defendants seek summary judgment against the § 1983

claims based on qualified immunity.  The doctrine of qualified immunity protects "government

officials performing discretionary functions . . . from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known."  *Harlow v. Fitzgerald*, 457 US 800, 818 (1982).

Therefore, public officials are generally immune from civil liability unless their actions violate

clearly established law because "a reasonably competent public official should know the law

governing his conduct."  *Id*.  "The qualified immunity standard gives ample room for mistaken

judgments by protecting all but the plainly incompetent or those who knowingly violate the law."

*Hunter v. Bryant*, 502 US 224, 229 (1991) (citation and internal quotations omitted).

The qualified immunity inquiry has traditionally involved two prongs. First, the court

must decide whether the plaintiff has shown that a constitutional or statutory right has been

violated. *Saucier v. Katz*, 533 US 194, 201 (2001). If the first step is satisfied, the court must

then decide whether the right at issue was "clearly established" at the time of the alleged

violation. *Id*. However, the Supreme Court recently held that courts may "exercise their sound

discretion in deciding which of the two prongs of the qualified immunity analysis should be

addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*,

129 S Ct 808, 818, 555 US 223, —, (2009).

For the reasons set forth below, the undisputed facts fail to reveal any violation of any of

Tyson's constitutional rights, thus entitling Vetter, Peterson and Cassebarth to qualified

immunity for damages on the § 1983 claims.

### 1. **Eighth Amendment Excessive Force Claim**

Tyson alleges that defendants violated his rights:

> to be free from excessive force and unreasonable seizure as guaranteed
> him by the fourteenth amendment to the United States Constitution's
> guarantee to bodily security and liberty and the fourth amendment to the
> United States Constitution's right to be free from unreasonable physical
> seizure.

Complaint, ¶ VII.A.

Because Tyson was incarcerated at the time of the incident, his right to be free of

excessive force derives from the Eighth Amendment and not from the Fourth Amendment for

unlawful search and seizure. *See Bell v. Wolfish*, 441 US 520, 535-36; *Pierce v. Multnomah*

*County, Or.*, 76 F3d 1032, 1043 (9th Cir 1996) ("[T]he Fourth Amendment sets the applicable constitutional limitations on the treatment of an arrestee detained without a warrant up until the time such arrestee is released or found to be legally in custody based upon probable cause for arrest."). Thus, he has no claim under the Fourth Amendment.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 US 1, 6-7 (1992). In determining the purpose for using force, a court may evaluate the need for "application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id* at 7 (internal citation omitted); *LeMaire v. Maass*, 12 F3d 1444, 1454 (9th Cir 1993).

An Eighth Amendment excessive force claim requires that a plaintiff show more than a *de minimis* use of force and while a prisoner may believe that his rights have been violated, "[n]ot every push or shove . . . violates a prisoner's constitutional rights." *Hudson*, 503 US at 9-10 (internal quotation and citation omitted). Recovery for mental or emotional injury "requires a prior showing of physical injury that need not be significant but must be more than *de minimis*." *Oliver v. Keller*, 2002 WL 826893, * 3 (9th Cir 2002) (holding that a painful canker sore and back and leg pain are *de minimis* and will not support a claim for mental or emotional injury under the Prisoner Litigation Reform Act).

///

///

12 - FINDINGS AND RECOMMENDATION

### a. **Cassebarth**

Tyson has alleged no facts that Cassebarth was involved in the incident with the pepper spray.  Thus, she is entitled to summary judgment against the excessive force claim.

### b. **Application of Force**

Viewing the evidence in the light most favorable to Tyson, no genuine issue of material fact exists as to the purpose of the force used by Vetter or Peterson, including the use of pepper spray and restraint of Tyson.  That purpose was an effort to restore discipline, not to maliciously and sadistically cause harm.

Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  *Whitley v. Albers*, 475 US 312, 321-22 (1986), citing *Bell*, 441 US at 547 (1979).  "That deference extends to a prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline."  *Id.*  ODOC employees are authorized to apply physical force "when and to the degree that it reasonably appears necessary," including for self-defense or to defend another person against an inmate by reasonable force and to overcome an inmate's physical resistance to a valid order.  OAR 291-013-0065(1), (1a), (1f).  ODOC employees are also authorized to use reactive force "where time and circumstances do not permit approval by a supervisor or consultation or planning."  OAR 291-013-0080.

Vetter's and Peterson's use of force complied with these prison regulations developed to preserve internal order and discipline and maintain institutional security.  Vetter gave Tyson a

valid order to return to his cell after he saw Tyson make a punching motion into another inmate's cell. Tyson refused to enter his cell and declared that he would not do so. He also resisted valid orders to face the wall, put his hands behind his back, and not move. He made a threatening gesture, was sprayed with OC spray, and then attacked both officers.

Tyson argues that there is a factual issue as to whether Vetter first ordered him into his cell or whether the cell was open for him to enter. Tyson Decl., p. 2. However, this is not a material fact. It is irrelevant whether his cell was open or not. Tyson was sprayed and restrained only after he repeatedly made threatening comments to correctional officers, refused to turn to the wall, and then turned his head towards Vetter after he was told to stop moving.

### c. **Amount of Force**

As a result of Tyson's actions, Peterson sprayed Tyson with OC spray in two second bursts. Vetter also struck Tyson on the jaw as he and Peterson attempted to restrain him.

Tyson alleges that he suffered "lasting painful chemical burns to the soft tissues of his face along with bruises and contusions of those soft tissues which resulted in lasting pain and bleeding from the mouth" and "bruises and contusions of the soft tissues of the back, arms and legs along with wrenching and spraining of the muscles and soft tissues of the neck, back, arms, and legs." Complaint, ¶ 34. In addition, he has "suffered and continues to suffer, extreme debilitating emotional and mental duress, stress and anxiety." *Id.* However, there is no medical documentation to support these allegations. The only medical evidence reveals that directly after the incident, Tyson had red, weeping eyes, a runny nose, and blood on his right cheek. Though he complained of a loose bridge, he refused any medical attention that day. These injuries do not indicate the use of unreasonable force.

Defendants also have shown that the force which caused these injuries was reasonable given the safety threat to prison staff.  Vetter was the only correctional staff member on O-Unit when the incident began.  A total of five inmate orderlies, including Tyson, were free to move about the unit.  Concern for his physical safety prompted Vetter to radio for backup.  Given Tyson's continued resistance to orders, declarations that he would not follow orders, and the low ratio of guards to unrestrained inmates on the block, Peterson made a reasonable choice employing OC spray in an attempt to bring Tyson into compliance.  Tyson's escalating behavior and assault prompted Vetter to strike Tyson.  Under the circumstances, Vetter's response to Tyson's assault was a reasonable response because of the risk that Tyson and/or other unrestrained inmates could cause further injury.

### d.  Attempts to Temper Severity of Response

Before using any force, Vetter and Peterson gave numerous verbal orders to Tyson to go to his cell, stand against the wall, put his hands behind his back, and not move.  They also warned him that failure to comply with orders would result in the use of OC spray.  Tyson ultimately complied with the orders but also made a threat, "You spray me and I will kick your ass."  Only when Tyson made a hostile move towards Vetter did Peterson apply a two second burst of OC spray.  Tyson continued his assaults, and Peterson gave Tyson orders to stop resisting and continued to apply OC spray.  When Tyson assumed a fighting stance and attacked Vetter, Vetter then used physical force. Vetter employed a maneuver in order to pin Tyson against the wall and temporarily hold him until help could arrive and effectively restrain Tyson. This maneuver was employed to minimize the danger Tyson posed to himself and others.  Trial Tr., pp. 69-70.

15 - FINDINGS AND RECOMMENDATION

Tyson generally argues that defendants have no qualified immunity because Peterson knowingly and willfully used excessive force by administering the OC spray when Tyson was complying with orders and not resisting. He argues "the act of turning ones [head] is not sufficient reason to pursuant to the [ODOC] procedure to spray an inmate." Tyson Decl., p. 3. In support of his argument, Tyson cites a portion of his appellate brief which addressed jury instruction errors in his criminal trial. The excerpt he submits primarily addresses his self-defense claim and does not support a claim that Vetter's and Peterson's behavior was malicious or sadistic.

### e. Conclusion

No genuine issue of material fact exists as to whether Vetter and Peterson used excessive force. Tyson has presented no evidence to show that Vetter and Peterson violated his Eighth Amendment right by using force for any reason other than to maintain or restore discipline. Thus, Vetter and Peterson should be granted summary judgment as to the excessive force claim.

### 2. Fourteenth Amendment Claim

Tyson alleges he was deprived of his right to be free of bodily security under the Fourteenth Amendment. Complaint, ¶ 30. He also alleges he was deprived of a liberty interest under the Fourteenth Amendment "to be free from unwarranted prosecution, both administrative in the form of a prison action and by way of criminal charges brought to bear in the Washington County Circuit Court." *Id*, ¶ 31.

The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The procedural guarantees of the Fourteenth Amendment's due process clause apply only when a constitutionally

protected liberty or property interest is at stake. *See Ingraham v. Wright*, 430 US 651, 672-73 (1977); *Bd. of Regents v. Roth*, 408 US 564, 569 (1972); *Jackson v. Carey*, 353 F3d 750, 755 (9th Cir 2003).

Claims of excessive force brought pursuant to § 1983 "must be analyzed under the explicit textual sources of constitutional protection found in the Fourth and Eighth Amendments, rather than under the 'more subjective standard of substantive due process.'" *Esplanade Properties, LLC v. City of* Seattle, 307 F3d 978, 982 n6 (9th Cir 2002), *cert denied*, 539 US 926 (2003), citing *Armendariz v. Penman*, 75 F3d 1311, 1319 (9th Cir 1996). Because Tyson can bring a claim for excessive force under the Eighth Amendment, he is barred from alleging the same claim based on denial of a liberty interest to "bodily security" under the Fourteenth Amendment. Similarly, his allegation of criminal prosecution without probable cause must be brought under the Fourth Amendment, rather than under the more general protections afforded by the Fourteenth Amendment. *Albright v. Oliver*, 510 US 266 (1994) (Rehnquist, C.J., for plurality). Thus, Vetter and Peterson should be granted summary judgment against the Fourteenth Amendment claim.

### 3. **Malicious Prosecution Claim**

To prove a malicious prosecution claim under § 1983, the plaintiff "must show that the defendants prosecuted [him] with malice and without probable cause, and that they did so for the purpose of denying [him] equal protection or another specific constitutional right." *Awabdy v. City of Adelanto*, 368 F3d 1062, 1066 (9th Cir 2004), quoting *Freeman v. City of Santa Ana*, 68 F3d 1180, 1189 (9th Cir 1995). The plaintiff must also prove that the underlying criminal action terminated in his favor. *Id* at 1067.

"Filing of a criminal complaint immunizes investigating officers . . . from damages suffered thereafter because it is presumed that the prosecutor filing the complaint exercised independent judgment in determining that probable cause for an accused's arrest exists at that time." *Smiddy v. Varney*, 665 F2d 261, 266 (9th Cir 1981), *overruled in part on other grounds by Beck v. City of Upland*, 527 F3d 853, 865 (9th Cir 2008). A plaintiff may rebut this presumption with "a showing that the district attorney was pressured or caused by the investigating officers to act contrary to his independent judgment [which] will rebut the presumption and remove the immunity." *Id.* This rebuttal may include evidence that officers "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Colbert v. Fontana Police Dept.,* 300 Fed Appx 490, 491 (9th Cir 2008), quoting *Awabdy*, 368 F3d at 1067. However, "a plaintiff must provide more than an account of the incident in question that conflicts with the account of the officers involved." *Newman v. County of Orange*, 457 F3d 991, 993-94 (9th Cir 2006).

Tyson alleges that Cassebarth "tailored the facts in his [*sic*] report to allow for the cover up of the ODOC excessive force assaultive behavior and unwarranted prosecution of" him. Complaint, ¶ 32. In support, he alleges that "Cassebarth's report conveniently declined to report any references to [Tyson] having complied with orders to place his hands behind his back." *Id*, ¶ 27.

Tyson is correct that compliance with at least one of the orders was not included in Cassebarth's report. Cassebarth Decl., Attach. 1, p. 4. However, this omission does not rebut the presumption of independent judgment. First, Cassebarth's report attached the incident reports of

the corrections officers which do refer to Tyson's compliance with some of the orders. Second, compliance with some orders does not amount to exculpatory evidence because Tyson also threatened the officers and moved towards Vetter, prompting the initial use of the OC spray, and then towards Peterson, prompting the use of more OC spray and physical force. Tyson Decl., pp. 2-3. Tyson has submitted no evidence of investigators improperly exerting pressure, knowingly providing misinformation, or other wrongful or bad conduct. Furthermore, Tyson cannot overcome the fact that a jury also found him guilty of these charges. Thus, defendants should be granted summary judgment on Tyson's malicious prosecution claim.

### 4. **Conspiracy Claim**

Tyson alleges that defendants participated in a conspiracy to bring false criminal charges against him as a cover-up of their use of excessive force. Complaint, ¶ 32. However, he alleges no facts to support any "meeting of the minds" among defendants to deprive him of his constitutional rights. *See United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1540-41 (9th Cir 1989). Accordingly, defendants should be granted summary judgment against the conspiracy claim.

## IV. **Collateral Estoppel**

Even if Tyson's § 1983 claims did survive, he is collaterally estopped from raising them based on his conviction of Assault in the Fourth Degree and Assaulting a Public Safety Officer for the same incident. "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case." *Allen v. McCurry*, 449 US 90, 94 (1980) (citation

omitted).  If a particular claim would be barred under a state's law of collateral estoppel, then a § 1983 claim would be barred as well.  *Id* at 94-96.

In Oregon, issue preclusion applies if:  (1) "[t]he issue in the two proceedings is identical"; (2) the issue actually was "litigated and was essential to a final decision on the merits in the prior proceeding"; (3) "[t]he party sought to be precluded has had a full and fair opportunity to be heard on that issue"; (4) "[t]he party sought to be precluded was a party or was in privity with a party to the prior proceeding"; and (5) "[t]he prior proceeding was the type of proceeding to which this court will give preclusive effect."  *Barackman v. Anderson*, 338 Or 365, 368, 109 P3d 370, 372 (2005), citing *Nelson v. Emerald People's Utility Dist.*, 318 Or 99, 103, 862 P2d 1293, 1296 (1993).  The party asserting issue preclusion has the burden of proving that the issue is precluded.  *Enquist v. Oregon Dept. of Agric.*, 478 F3d 985, 1007 (9th Cir 2007), citing *State Farm Fire & Cas. Co. v. Century Home Components, Inc.*, 275 Or 97,104, 550 P3d 1185, 1188 (1976).

At trial, the jury was given the following instructions:

For Assault in the Second Degree:

> . . . [T]he State must prove beyond a reasonable doubt the following three elements: first, that the act occurred in Washington County, Oregon; second, that the act occurred on or about July 25th, 2007; third, that Jesse James Tyson knowingly caused physical injury to Scott Vetter by means of a dangerous weapon . . .

For Assault in the Fourth Degree:

> . . . [T]he State must prove beyond a reasonable doubt the following three elements: first, that the act occurred in Washington County, Oregon; second, that the act occurred on or about July 25th, 2007; third, that Jesse James Tyson knowingly caused physical injury to Scott Vetter . . .

For Assaulting a Public Safety Officer:

> . . . [T]he State must prove beyond a reasonable doubt the following five
> elements: first, that the act occurred in Washington County, Oregon;
> second, that the act occurred on or about July 25th, 2007; third, that Jesse
> James Tyson knowingly caused physical injury to Scott Vetter; fourth, that
> Jesse James Tyson knew Scott Vetter to be a corrections officer; fifth, that
> Scott Vetter was acting in the course of official duty.

Trial Tr., pp. 562-63.

Because Tyson claimed that he acted in self-defense, the jury also was given the

following instruction:

> The defense of self-defense has been raised.  A person is justified in using
> physical force on another person to defend himself from what he
> reasonably believes to be the use or imminent use of unlawful physical
> force.
>
> In defending, a person may only use that degree of force which he
> reasonably believes to be necessary. The burden of proof is on the State to
> prove beyond a reasonable doubt that the defense does not apply.
> Oregon law provides that within a Department of Corrections setting
> physical force shall be employed when it reasonably appears that other
> alternatives are not feasible to the situation.
>
> When the use of forces is justified, only the amount and type of force that
> reasonably appears to be necessary to accomplish the authorized objective
> shall be used. An employee shall consider all types.

*Id*, pp. 564-65.

Tyson's primary argument in opposition to summary judgment is that his actions were

justified as self-defense because Vetter and Peterson had no reason to use reactive force on him.

Tyson alleges that he did comply with the orders and that Cassebarth "conveniently" omitted his

compliance from her reports.  Complaint, ¶¶ 14, 27.  In his declaration, Tyson admits that he

lunged at Peterson but only "after being maliciously sprayed in the face."  Tyson Decl., pp. 2-3.

21 - FINDINGS AND RECOMMENDATION

He also attaches excerpts from his appellate brief in which he argued for a new trial based on the jury instructions on his self-defense claim. *Id*, p. 3.

The issue of self-defense, however, was litigated in the criminal trial. By returning a general verdict finding Tyson guilty of Assault in the Fourth Degree and of Assaulting a Public Safety Officer, the jury necessarily determined that Tyson's actions were not justified as self-defense. Tyson had a full and fair opportunity to be heard on the issue in his criminal trial. Therefore, he cannot raise it here to justify his actions.

## V.  **Injunctive Relief**

Tyson requests injunctive relief based on his assertion that Vetter and Peterson violated his constitutional rights by unlawfully using force on him. He argues there is a threat that they will act similarly in the future.

Injunctive relief is only available if a plaintiff has demonstrated a "likelihood of substantial and immediate irreparable injury," including a "real or immediate threat that [he] will be wronged again." *City of Los Angeles v. Lyons*, 461 US 95, 111 (1983), quoting *O'Shea v. Littleton*, 414 US 488, 502 (1974). The Prison Litigation Reform Act ("PLRA")[3] establishes a comprehensive set of standards to govern prospective relief in cases involving prison conditions. It provides that prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 USC § 3626(a)(1). Thus, a district

---

[3]  The PLRA requires that inmates who file suits concerning prison conditions must exhaust all remedies prior to the filing of a § 1983 action. 42 USC § 1997e(a). This exhaustion requirement is comprehensive and unyielding:  "The Supreme Court has now authoritatively concluded 'that the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.'"  *Bennett v. King*, 293 F3d 1096, 1098 (9th Cir 2002), quoting *Porter v. Nussle*, 534 US 516, 532 (2002). The record does not disclose whether Tyson exhausted his remedies, but defendants do not rely on this potential defense.

court faced with a suit about prison conditions may not grant or approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.*

As previously discussed, Tyson cannot prevail on his claims that defendants committed any constitutional violations. Moreover, he submits no evidence to demonstrate a likelihood of substantial and immediate irreparable injury and the threat to be wronged again. Thus, defendants should be granted summary judgment on Tyson's claims for injunctive relief.

## **RECOMMENDATION**

For the reasons set forth above, defendants' Motion for Summary Judgment (docket #66) should be granted, and a judgment should be entered in favor of defendants.

## **SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due March 18, 2011. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

///

///

///

///

**<u>NOTICE</u>**

This Findings and Recommendation is not an order that is immediately appealable to the

Ninth Circuit Court of Appeals.  Any Notice of Appeal pursuant to Rule 4(a)(1), Federal Rules of

Appellate Procedure, should not be filed until entry of a judgment.

DATED this 1st day of March, 2011.


s/_Janice M. Stewart_____
Janice M. Stewart
United States Magistrate Judge